CHARLES G. LOW v. REES PRINTING COMPANY.

FILED JUNE 6, 1894. No. 5390.

</div>

1. **Constitutional Law:** EIGHT HOUR LAW: CLASS LEGISLATION: RIGHT TO CONTRACT. Sections 1 and 3 of chapter 54 of the Session Laws of 1891 having provided, in effect, that for all classes of mechanics, servants, and laborers, excepting those engaged in farm or domestic labor, a day's work should not exceed eight hours, and that for working any employe over the prescribed time the employer should pay extra compensation in increasing geometrical progression for the excess over eight hours (the rate of payment for the eighth hour being taken as the basis upon which to reckon such progression), *held,* that these provisions are unconstitutional, (1) because the discrimination against farm and domestic laborers is special legislation; (2) because by the act in question the constitutional right of parties to contract with reference to compensation for services is denied.

2. ——: ——. It being apparent from an inspection of the entire act in question that sections 1 and 3 thereof formed an inducement to its passage, no part of said act can be sustained as constitutional. Following *Trumble v. Trumble,* 37 Neb., 340.

ERROR from the district court of Douglas county. Tried below before WAKELEY, DOANE, and DAVIS, JJ.

The opinion contains a statement of the case.

*Mahoney, Minahan & Smyth,* for plaintiff in error:

Chapter 54, Laws of 1891, an act to regulate the hours of labor of mechanics, servants, and laborers, does not of-

fend against the last sentence of section 15, article 3, of the constitution, which is as follows: "In all cases where a general law can be made applicable, no special law shall be enacted." (*Hingle v. State*, 24 Ind., 34; *Heridia v. Ayres*, 12 Pick. [Mass.], 344; *McAunick v. Mississippi & M. R. Co.*, 20 Ia., 338; *State v. Graham*, 16 Neb., 76; Cooley, Constitutional Limitations, 129; *Haskell v. City of Burlington*, 30 Ia., 237; *State of Louisiana v. Schlemmer*, 10 L. R. A. [La.], 135; *Barbier v. Connolly*, 113 U. S., 27; *Minneapolis & St. L. R. Co. v. Beckwith*, 129 U. S., 26; *Hancock v. Yaden*, 6 L. R. A. [Ind.], 576; *Vermont Loan & Trust Co. v. Whithed*, 49 N. W. Rep. [N. Dak.], 318; *Smith v. Judge of Twelfth District*, 17 Cal., 547.)

Suppose the law is a special one. The constitution does not prohibit, under all circumstances, the enacting of special laws. It prohibits it only where a general law can be made applicable. Could a general law have been made applicable? If this be a special law, the legislature by passing it has answered the question in the negative. Is that answer reviewable by this court, or is it final? The authorities say it is final. (*City of Wichita v. Burleigh*, 36 Kan., 34; *Gentile v. State*, 29 Ind., 412; *State v. Hitchcock*, 1 Kan., 184; *Beach v. Leahy*, 11 Kan., 27; *Marks v. Trustees of Purdue University*, 37 Ind., 155; *State v. Tucker*, 46 Ind., 355; *State v. County Court*, 50 Mo., 317; *State v. County Court*, 51 Mo., 82; *Richmond v. Board of Supervisors*, 42 N. W. Rep. [Ia.], 422.)

The act is not violative of that provision of the constitution which declares that no person shall be deprived of his liberty or property without due process of law. (Cooley, Constitutional Law, 430; *Murray v. Hoboken Land & Improvement Co.*, 18 How. [U. S.], 277; *In re Brosnahan*, 18 Fed. Rep., 66; *Rowan v. State*, 30 Wis., 146; *Ex parte Ah Fook*, 49 Cal., 406; *Weimer v. Bunbury*, 30 Mich., 210; *Brown v. Board of Levee Commissioners*, 50 Miss., 479; *Wurts v. Hoagland*, 114 U. S., 606; *Kennard v. Morgan,*

92 U. S., 480; *McMillen v. Anderson*, 95 U. S., 37; *Davidson v. New Orleans*, 96 U. S., 105; *Dent v. State of West Virginia*, 28 Cent. L. J. [W. Va.], 264; *Hawthorn v. People*, 109 Ill., 302; *Kansas P. R. Co. v. Mower*, 16 Kan., 576; Tiedeman, Limitations of Police Power, sec. 178; *Powell v. Commonwealth*, 114 Pa St., 265, 127 U. S., 678; *State v. Moore*, 10 S. E. Rep. [N. Car.], 144; *Alexander v. Archer*, 24 Pac. Rep. [Nev.], 374; *Mohle v. Tschirch*, 63 Cal., 382; *Mugler v. Kansas*, 123 U. S., 623; *Singer v. Maryland*, 8 L. R. A. [Md.], 551; *Territory of Washington v. Ah Lim*, 9 L. R. A. [Wash.], 395; *State v. Addington*, 77 Mo., 110; *Butler v. Chambers*, 36 Minn., 69; *State v. Marshall*, 64 N. H., 549; *Messenger v. State*, 25 Neb., 676; *Donnell v. State*, 48 Miss., 661; *Munn v. Illinois*, 94 U. S., 113; *Nash v. Page*, 80 Ky., 539; *Munn v. People*, 69 Ill., 80; *Hockett v. State*, 105 Ind., 250; *Davis v. State*, 68 Ala., 58; *People v. Budd*, 117 N. Y., 1.)

The law is not unconstitutional as limiting the power of the citizen to contract concerning a certain subject. (*Ogborn v. Hoffman*, 52 Ind., 439; *Smith v. Tyler*, 51 Ind., 512; *Markel v. Spitler*, 28 Ind., 488; *Maloney v. Newton*, 85 Ind., 565; *Kneettle v. Newcomb*, 22 N. Y., 249; *Curtis v. O'Brien*, 20 Ia., 376; *Moxley v. Ragan*, 10 Bush [Ky.], 156; *McLane v. Elmer*, 4 Ind., 239; *Develin v. Wood*, 2 Ind., 102; *Bauer v. Samson Lodge*, 102 Ind., 262; *Dugan v. Thomas*, 79 Me., 221; *German-American Ins. Co. v. Etherton*, 25 Neb., 508; *Home Ins. Co. v. Morse*, 20 Wall. [U. S.], 455; *Doyle v. Continental Ins. Co.*, 94 U. S., 535; *Taylor v. Saurman*, 110 Pa. St., 3; *Herdic v. Roessler*, 109 N. Y., 127; *New v. Walker*, 108 Ind., 365; *United States v. Fisher*, 2 Cranch [U. S.], 358; *Warren v. Sohn*, 112 Ind., 213; *Churchman v. Martin*, 54 Ind., 380; *Long v. Straus*, 107 Ind., 94; *Hudson Canal Co. v. Pennsylvania Coal Co.*, 75 U. S., 276.)

*Ambrose & Duffie, contra,* insisting that the statute should

13

be held to be in conflict with constitutional principles as
an attempt to legislate in favor of a particular class, and
to abridge the guarantied rights of citizens, cited: *Deppe v.
Chicago, R. I. & P. R. Co.,* 36 Ia., 52; *Foxworthy v. City
of Hastings,* 23 Neb., 772; *Wally v. Kennedy,* 2 Yerg.
[Tenn.], 554; *Durham v. Lewiston,* 4 Greenl. [Me.], 140;
*Lewis v. Webb,* 3 Greenl. [Me.], 326; *Holden v. James,* 11
Mass., 396; *Picquet, Appellant,* 5 Pick. [Mass.], 64; *Budd
v. State,* 3 Humph. [Tenn.], 483; *Godcharles v. Wigeman,*
113 Pa. St., 431; *Durkee v. City of Janesville,* 28 Wis.,
464; *Calder v. Bull,* 3 Dal. [U. S.], 387*; *Fletcher v. Peck,*
6 Cranch [U. S.], 143; *Bank of the State v. Cooper,* 2 Yerg.
[Tenn.], 599; *Atchison & N. R. Co. v. Baty,* 6 Neb., 37;
*People v. Gillson,* 109 N. Y., 389; *Butchers' Union Slaugh-
ter House & Live Stock Landing Co. v. Crescent City Live
Stock Landing & Slaughter House Co.,* 111 U. S., 747;
*In re Jacobs,* 98 N. Y., 98; *People v. Millett,* 117 Ill., 291;
*State v. Goodwill,* 6 L. R. A. [W. Va.], 621, and cases cited
in notes.

RYAN, C.

In the district court of Douglas county plaintiff in error
filed his petition, wherein were stated three causes of ac-
tion. Of these the third cannot be reviewed, for the reason
that there was no motion for a new trial filed or passed
upon in respect to it after a trial upon evidence adduced.
The stipulation waiving the motion for a new trial and
consenting that the action in this court should be treated
as if such motion had actually been filed and ruled upon
in the district court ignores the consideration that is due
to the trial court, where the motion in question should
have been duly passed upon, that whatever errors were
presented thereby might be corrected. The consideration
of this case, for the reason just indicated, will, therefore,
be confined to the first and second causes of action stated
in the petition.

After alleging that the defendant was a corporation doing business in the city of Omaha, the averments of plaintiff in his petition were as follows: "Further complaining, plaintiff states for his first cause of action that on the 10th day of August, 1891, he contracted with the defendant to work for it as a printer for thirty cents per hour; that pursuant to said contract he entered the employment of said defendant, and that on said 10th day of August said defendant worked this plaintiff eleven hours. Said defendant thereby became indebted to this plaintiff in the sum of $6.60; that is to say, $2.40 for the first eight hours worked, 60 cents for the ninth hour worked, $1.20 for the tenth hour worked, and $2.40 for the eleventh hour worked. Of said sum thus due, defendant has paid plaintiff $3, and no more.

" For a second cause of action plaintiff states that on the 8th day of August, 1891, he, at the request of the defendant, entered into a contract with the said defendant, which contract was in the words and figures following, viz.:

"'To all employes of Rees Printing Co.: From and including August 1, 1891, all employes of this company will be employed and paid by the hour for the number of hours they work, at the same rate of wages now paid, and not by the day. Any employe who is willing to work the same number of hours as heretofore at the rate of wages heretofore paid him will report in writing at once to the undersigned.

"'July 30th, 1891.          Rees Printing Co.'

"'Receipt of the above rule and regulation is hereby acknowledged. I am willing to continue in the service of the company subject to the same.

"'August 8, 1891.          Charles G. Low.'"

" That the rate of compensation or wages agreed upon between the plaintiff and defendant and paid to the plaintiff by said defendant prior to entering into said contract was $3 per day for each day worked by plaintiff, which

day consisted of ten hours; that on said 8th day of August, 1891, the defendant worked this plaintiff ten hours, and thereby became indebted to him in the sum of $4.20; that is to say, $2.40 for the first eight hours, 60 cents for the ninth hour, and $1.20 for the tenth hour worked. Of said sum thus due to the plaintiff defendant has paid $3, and no more."

A demurrer was filed to the above two causes of action on the grounds following:

"1. The said petition does not state facts constituting a cause of action against the defendant, nor does any of the counts thereof state facts constituting a cause of action in plaintiff's favor against the defendant.

"2. Chapter 54 of the acts of the twenty-second session of the legislature of Nebraska, under the provisions of which this action was brought, and by virtue of which plaintiff must recover, if at all, is unconstitutional and void, and in contravention of the constitution of Nebraska and of the United States.

"(a.) It seeks to take away and limit the right of the citizen to enter into contracts relating to legal and lawful business.

"(b.) It seeks to abridge the rights of the people in disposing of their lawful property and the purchase of the same.

"(c.) It is special and class legislation, and an attempt on the part of the legislature to grant special immunities and privileges upon certain employes and employers.

"(d.) The statute, while intending to be general in its operation, excepts certain of our citizens from its provisions.

"(e.) It seeks to abridge the privileges of certain of our citizens and deprive them of their property without due process of law, and denies to certain of our citizens equal protection of the law, and is, therefore, in conflict with sections 1 and 2 of article 3 of the constitution of Ne-

braska, and section 1 of the fourteenth amendment of the constitution of the United States.

"3. Said act is broader than the title, in so far as it provides for a penalty for violation thereof, and seeks to fix the compensation of the employe, and to that extent the provisions of the act are in conflict with section 11, article 3, of the constitution of this state.

"4. Said act is in conflict with section 5, article 8, of the constitution of Nebraska, in that it seeks to give to the employe a part of the penalty provided for its violation."

This demurrer was argued in the aforesaid district court, Judges Wakeley, Doane, and Davis presiding, by whom, upon due consideration, it was sustained as to said first and second causes of action. Thereupon, the plaintiff electing to stand on said two causes of action and refusing to further plead, judgment was thereon rendered in favor of the defendant. By petition in error plaintiff has duly presented for review by this court the same questions passed on in the district court.

Chapter 54, specially described in, and against which the demurrer was directed, is in the following language:

"*Be it enacted by the Legislature of the State of Nebraska:*

"Section 1. That eight hours shall constitute a legal day's work for all classes of mechanics, servants, and laborers throughout the state of Nebraska, excepting those engaged in farm and domestic labor.

"Sec. 2. Any officer or officers, agent or agents of the state of Nebraska, or any municipality therein, who shall openly violate or otherwise evade the provisions of this act shall be deemed guilty of malfeasance in office, and be suspended or removed accordingly by the governor or head of the department to which such officer is attached.

"Sec. 3. Any employer or corporation working their employes over the time specified in this act shall pay as extra compensation double the amount per hour as paid for previous hour.

"Sec. 4. Any party or parties contracting with the state of Nebraska, or any such corporation or private employer, who shall fail to comply with or secretly evade the provisions hereof by exacting or requiring more hours of labor for the compensation agreed to be paid per day than is herein fixed or provided for shall, on conviction thereof, be deemed guilty of a misdemeanor and be punished by a fine of not less than one hundred ($100) dollars nor more than one thousand ($1,000) dollars."

The constitutional provisions with which it is claimed the above act is in conflict are, first, the closing sentence of section 15, article 3, that "in all other cases where a general law can be made applicable no special law shall be enacted;" second, the third section of the bill of rights, that "no person shall be deprived of life, liberty or property without due process of law." It is also urged against the act that it is void, as an attempt by the legislature to prevent persons legally competent to enter into contracts from making their own contracts. In the present controversy there is necessarily involved the validity of the entire act, for although only the first and third sections are directly attacked, yet it is apparent, from an inspection of the act as a whole, that these two sections formed an inducement to its passage. The act must therefore stand or fall as an entirety. (*Trumble v. Trumble*, 37 Neb., 340.)

There seems to have been an oversight as to the first cause of action, for the averments therein were, in substance, that there was a contract of employment at the rate of thirty cents per hour; that the plaintiff was by the defendant worked eleven hours, and had received payment to the amount of but $3; that is, for ten hours' work at the rate stipulated. On the face of the petition there was, therefore, unpaid thirty cents upon the first cause of action. This has not been insisted upon in argument, however, and will therefore receive no further attention.

The second cause of action avers that there was a written

agreement between the parties that after August 1, 1891, employment should be by the hour at the rate of $3 for ten hours' work; that is to say, plaintiff was to receive thirty cents per hour, but he agreed to work each day ten hours It is alleged that on August 8, 1891, plaintiff worked ten hours and had been paid therefor $3. According to the terms of the agreement between the parties, the plaintiff, by the payment of $3, had received all that was his due. By virtue of the provisions of section 3 of the act under consideration it is insisted, however, that for the ninth hour plaintiff is still entitled to receive thirty cents, and for the tenth hour he is yet entitled to ninety cents. This clearly presents the question whether a contract fairly entered into, and in compliance with which both parties have acted to the full discharge of their obligations thereunder, must be deemed modified by the existing provisions of the statute, irrespective of the intention of the parties as expressed in their contract.

Until a comparatively recent period it would have been quite difficult to find adjudications pertinent to the legal propositions involved. For some reason, not necessary to consider, there has in modern times arisen a sentiment favorable to paternalism in matters of legislation. The outgrowth of this sentiment has been legislation for the regulation of the media of payment; the manner in which products shall be measured or weighed when compensation depends upon measure or weight; the hours of labor, and other kindred subjects. In each instance the statutory provision is necessarily a restriction of the right to regulate relations and duties by contract. To the fact that these attempts have recently been so frequently made, we are indebted for a number of well considered adjudications bearing upon the questions now presented for our determination. While there has not been entire unanimity, the decided weight as well as the number of authorities are coincident with those from which quotations will hereafter be

made. ·That these quotations are freely made requires no other apology than that the cases quoted from are so ably and carefully considered that to them we should be hopeless to make any additions or improvement by the most careful research of which we are capable. The three several objections to the act under consideration will be taken up in the order of their statement, and considered rather in the light of authority than in that of original reasoning or research.

1. The first section of the statute under consideration provided what number of hours should constitute a legal day's work for all classes of laborers except those engaged in farm or domestic labor. The argument made in favor of the necessity that each day the excess over eight hours should be devoted to rest, recreation, and mental improvement loses much of its force when these very desirable benefits are by the statute itself restricted to certain defined classes of laborers, no one of which, independently of the statute, devotes so many hours to labor as do the classes denied the protection of the statute. Legislation of this kind is always fraught with danger, hence arose the prohibition of special legislation when avoidable which is found in our constitution. In *State v. Loomis*, 22 S. W. Rep. [Mo.], 350, we find an opinion of the supreme court of Missouri, one judge alone dissenting, of which the syllabus is as follows: "Revised Statutes, 1889, sections 7058–7060, making it unlawful for any corporation, person, or firm engaged in manufacturing or mining to issue for the payment of wages any order, check, or other token of indebtedness, payable otherwise than in lawful money, unless the same is negotiable and redeemable at its face value in cash or in goods at the option of the holder at the store or other place of business of the corporation, person, or firm, without placing similar restrictions on others employing labor, is unconstitutional as class legislation." In the majority opinion which was filed March 25, 1893, class

legislation is ably discussed in the following language: "There is no doubt but many of our legislative enactments operate upon classes of individuals only, and they are not invalid because they so operate, so long as the classification is reasonable and not arbitrary. Thus, it is perfectly competent to legislate concerning married women, minors, insane persons, bankers, common carriers, and the like; and the power of the legislature to prescribe police regulations applicable to localities and classes is very great, because such laws are designed to protect property and the safety, health, and morals of the citizen; but classification for legislative purposes must have some reasonable basis upon which to stand. It must be evident that differences which would serve for a classification for some purposes furnish no reason whatever for a classification for legislative purposes. The differences which will support class legislation must be such as in the nature of things furnish a reasonable basis for separate laws and regulations. Thus, the legislature may fix the age at which persons shall be deemed competent to contract for themselves, but no one will claim that competency to contract can be made to depend upon stature or color of the hair. Such a classification for such a purpose would be arbitrary and a piece of legislative despotism, and, therefore, not the law of the land. When speaking upon this subject, Judge Cooley says: 'The doubt might also arise whether a regulation made for any one class of citizens entirely arbitrary in its character and restricting their rights and privileges or legal capacity in a manner before unknown to the law could be sustained notwithstanding its generality. Distinctions in these respects must rest upon some reason upon which they can be defended, like the want of capacity in infants and insane persons; and if the legislature should undertake to provide that persons following some specified lawful trade or employment should not have capacity to make contracts, or to build such houses as others

were allowed to erect, or in any other way to make such use of their property as was permissible to others, it can scarcely be doubted that the act would transcend the due bounds of legislative power, even though no express constitutional provision could be pointed out with which it would come in conflict. To forbid an individual or a class the right to the acquisition and enjoyment of property in such manner as should be permitted to the community at large, would be to deprive them of liberty in particulars of primary importance to their pursuit of happiness; and those who shall claim a right to do so ought to be able to show specific authority therefor instead of calling upon others to show how and where the authority is negatived.' (Cooley, Const. Lim. [6th ed.], 484.) There can be no doubt that the legislature may regulate the business of mining and manufacturing so as to secure the health and safety of the employes, but that is not the scope of the two sections of the statute now in question. They single out those persons who are engaged in carrying on the pursuits of mining and manufacturing and say to such persons: 'You cannot contract for labor payable alone in goods, wares, and merchandise. The farmer, the merchant, the builder, and the numerous contractors employing thousands of men, may make such contracts, but you cannot.' They say to the mining and manufacturing employes: 'Though of full age and competent to contract, still you shall not have the power to sell your labor for meat and clothing alone as others may.' It will not do to say these sections simply regulate payment of wages, for that is not their purpose. They undertake to deny to the persons engaged in the two designated pursuits the right to make and enforce the most ordinary, every-day contracts,—a right accorded to all other persons. This denial of the right to contract is based upon a classification which is purely arbitrary, because the ground of the classification has no relation whatever to the natural capacity of persons to contract."

After the above expression of its views the supreme court of Missouri reviewed the authorities bearing upon the question discussed. This review we shall quote, because therein is contained a condensed statement of the purport of numerous decisions which tend to enlighten the subject under discussion. The language in which this review was made is as follows:

"The supreme judicial court of Massachusetts had under consideration in *Commonwealth v. Perry*, 28 N. E. Rep., 1126, a statute which provides that 'no employer shall impose a fine upon, or withhold the wages or any part of the wages of, an employe engaged at weaving, for imperfections that may arise during the process of weaving.' It was held that if the act went no further than to forbid the imposition of a fine for imperfect work it might be sustained, but that the attempt to make inferior work answer a contract for good work presented a different question; that the right to acquire, possess, and protect property includes the right to make reasonable contracts which shall be under the protection of the law. Says the court: 'If it [the statute] be held to forbid the making of such contracts, and to permit the hiring of weavers only upon terms that prompt payment shall be made of the price for good work, however badly their work may be done, and that the remedy of the employer for their derelictions shall be only by suits against them for damages, it is an interference with the right to make reasonable and proper contracts in conducting a legitimate business which the constitution guaranties to every one when it declares that he has a natural, inalienable right of acquiring, possessing, and protecting property.'

"*Godcharles v. Wigeman*, 113 Pa. St., 431, 6 Atl. Rep., 354, was an action brought by Wigeman to recover wages as a puddler. Plea of payment, etc. During the time of his employment the plaintiff asked for and received orders from defendants on different parties for coal and other articles, which orders were honored by the parties on whom

drawn, and the defendants paid them. It seems an act of the legislature made all orders given by employers engaged in the business of manufacturing, to their workmen, payable in goods or anything but money, void. Speaking of these sections of the act the court said: 'They are utterly unconstitutional and void, inasmuch as by them an attempt has been made by the legislature to do what in this country cannot be done; that is, prevent persons who are *sui juris* from making their own contracts. The act is an infringement alike of the right of the employer and the employe. He may sell his labor for what he thinks best, whether money or goods, just as his employer may sell his iron or coal, and any and every law that proposes to prevent him from so doing is an infringement of his constitutional privileges, and consequently vicious and void.'

"In *State v. Goodwill*, 33 W. Va., 179, 10 S. E. Rep., 285, a statute of that state prohibited persons engaged in mining and manufacturing from issuing orders in payment for labor except as such should be made payable in money. It made a violation of its provisions a misdemeanor. The constitution of that state declares that all men have certain inherent rights; that is to say, 'the enjoyment of life and liberty, with the means of acquiring and possessing property and of pursuing and obtaining happiness and safety.' The statute was held unconstitutional after a full consideration. Says the court: 'The right to use, buy, and sell property, and contract in respect thereto, including contracts for labor, which is, as we have seen, property, is protected by the constitution.' The scope of the opinion is well summarized in the head-note in these words: 'It is not competent for the legislature under the constitution to single out owners and operators of mines and manufacturers of every kind and provide that they shall bear the burdens not imposed on other owners of property or employers of labor and prohibit them from making contracts which it is competent for other owners of property or employers

of labor to make.' And this ruling was followed and approved in *State v. Fire Creek Coal & Coke Co.*, 33 W. Va., 188, 10 S. E. Rep., 288.

"The statute brought in question in *Millett v. People*, 117 Ill., 294, required all coal produced in the state to be weighed on scales to be furnished by the mine owners, and subjected the mine owner to fine or imprisonment for a failure to comply with its provisions. By another section it was provided 'that all contracts for the mining of coal in which the weighing of coal as provided for in this act shall be dispensed with, shall be null and void.' It was held that the mine owners could not be compelled to make their contracts for mining coal so as to be regulated by weight; and that they could not be compelled to keep and use scales for such purposes, save when they saw fit to make contracts for mining on the basis of weight. The law was considered repugnant to the constitutional provision that 'no person shall be deprived of life, liberty, or property without due process of law;' that to single out coal-mine owners and prohibit them from making contracts which it was competent for other employers of labor to make was not due process of law. And for like reasons the same court held an act void which denied to persons and corporations engaged in mining and manufacturing the right to keep or be interested in a truck store for furnishing supplies, etc. (*Frorer v. People*, 31 N. E. Rep. [Ill.], 395.)"

The opinion above quoted from reversed the judgment of the second division of the same court reported in 20 S. W. Rep., 332, by which division it had been referred to the full bench for determination.

In *State v. Sheriff of Ramsey County* the supreme court of Minnesota filed an opinion on January 19, 1892, which is reported in 51 N. W. Rep., 112, in which was used this language: "In *Nichols v. Walter, supra*, 37 Minn., 264, it was held that the law was general and uniform in its operation which operates equally upon all the subjects

within the class for which the rule is adopted, but that the legislature cannot adopt an arbitrary classification, though it be made to operate equally upon each subject within the class; and the classification must be based on some reason suggested by such a difference in the situation and circumstances of the subjects placed in different classes as to disclose the necessity or propriety of different legislation in respect to them. In *State v. Donaldson,* 41 Minn., 74, a distinction or classification of dealers in medicines, based on the location of their places of business in respect to distance from drug stores, was held reasonable and not a mere arbitrary distinction. In *Johnson v. St. Paul & D. R. Co.,* 43 Minn., 224, this court in dealing with chapter 13, Laws 1887, defining the liability of railway companies to their employes, said, in substance, that not only must the statute treat alike, under the same conditions, all who are brought within it, but in its classifications it must bring within it all who are under the same conditions. 'Such law must embrace all and exclude none whose condition and wants render such legislation necessary or appropriate to them as a class.' (*Randolph v. Wood,* 49 N. J. Law, 88.) * * * No arbitrary distinction between different kinds or classes of business can be sustained, the conditions being otherwise similar. The statute is leveled against nuisance occasioned by dense smoke, and it can make no practical difference in what business the owners or occupants of the buildings in which such smoke is produced are engaged, or whether the heat evolved from the combustion of the fuel producing such smoke is applied to the generation of steam or other useful purposes; or, further, whether steam power is used in manufacturing or is applied to other uses, as a grain elevator or hoisting apparatus in a warehouse. We are obliged to hold that the distinction or classification attempted to be made is untenable."

There is perceived no reason why a resort to special legislation was necessary in respect to the subject-matter

of the act with which we are now dealing. If we are correct in this assumption, the language quoted is specially applicable to the provisions of the statute by which its benefits are withheld from domestic and farm laborers. These views are enunciated with somewhat more of confidence because they are in line with the reasoning of this court in *Atchison & N. R. Co. v. Baty*, 6 Neb., 37.

2. The third section of article 1 of the constitution of this state provides that "no person shall be deprived of life, liberty, or property without due process of law." What is implied by the term "due process of law" is a question which has received discussion by this court. In *Atchison & N. R. Co. v. Baty*, *supra*, it was held, in the language of the first paragraph of the syllabus, that "legislative authority cannot reach the life, liberty, and property of the individual, except when he is convicted of crime, or when the sacrifice of his property is demanded by a just regard for the public welfare." In the discussion of the principles involved in the case, from which the above quotation of the first paragraph of the syllabus was taken, GANTT, J., delivering the opinion of this court, said: "The terms 'due process of law' and 'the law of the land' —one or the other of which is found in all constitutions of the states—are said to mean the same thing; and it is quite clear that they are indifferently used in constitutions for the same purpose. They are said to refer to a pre-existing rule of conduct, and designed to exclude arbitrary power from every branch of the government. (*State v. Doherty*, 60 Me., 509; *Norman v. Heist*, 5 W. & S. [Pa.], 171; *State v. Simons*, 2 Spears [S. Car.], 767.) Hence these terms do not mean merely a legislative enactment, for, 'if they did, every restriction upon the legislative authority would be at once abrogated. For what more can a citizen suffer than to be taken, imprisoned, disseized of his freehold, liberties, and privileges; be outlawed, exiled, and destroyed; and be deprived of his property, his liberty, and

his life, without crime.   Yet all this he may suffer, if an
act of the assembly, simply denouncing these penalties
upon particular persons, or a particular class of persons, be
in itself the law of the land within the sense of the con-
stitution.' (*Hoke v. Henderson*, 4 Dev. [N. Car.], 1.)  Web-
ster interprets these terms to mean 'that every citizen shall
hold life, liberty, property, and immunities under the pro-
tection of the general rules which govern society.   Every-
thing which may pass under the form of an enactment is
not, therefore, to be considered as the law of the land;'
and, he says, 'if this were so, acts directly transferring one
man's estate to another, legislative judgments, decrees, and
forfeitures in every possible form would be the law of the
land.   There would be no general, permanent law for the
courts to administer or even to live under.   The adminis-
tration of justice would be an empty form, an idle cere-
mony.   Judges would sit to execute legislative judgments
and decrees, and not to declare the law, or administer the
justice of the country.' (5 Webster's Works, 487; *State v.
Doherty*, 60 Me., 509; *Holden v. James*, 11 Mass., 404;
*Lane v. Dorman*, 2 Scam. [Ill.], 240–1; *Commonwealth v.
Bryne*, 20 Gratt. [Va.], 165; *Bank of Columbia v. Okely*,
4 Wheat. [U. S.], 243.)  It is, however, true that subject
to the qualified negative of the governor, the legislature
possesses all the legislative power of the state; but as it is
said in *Taylor v. Porter*, 4 Hill [N. Y.], 144, 'under our
system of government the legislature is not supreme.   It
is only one of the organs of absolute sovereignty which
resides in the whole body of the people,' and, therefore,
as the 'security of life, liberty, and property lay at the
foundation of the civil compact, to say that the grant of
legislative power included the right to attack private prop-
erty would be equivalent to saying that the people had
delegated to their servants the power of defeating one of
the great ends for which government was established.'
(Smith's Const. Law, 484.)   This one great end of gov-

ernment is the protection of the absolute right of individuals—the life, liberty, and property of each citizen of the state." In *State v. Loomis, supra,* the term "due process of law" was discussed and applied to subjects kindred to those now under consideration. The court of appeals of Texas, in an opinion filed June 25, 1892, and found in *San Antonio & A. P. R. Co. v. Wilson,* 19 S. W. Rep., 910, cites with approval the case of the *Atchison & N. R. Co. v. Baty, supra.* Immediately following and enforcing their approval was a full review of the same subject as had been discussed by Judge GANTT, with a synopsis of the holdings of numerous courts with reference thereto. The length of this opinion forbids an extended quotation from the opinion to which reference has just been made, but its examination will be found to further illustrate and enforce the principles laid down in *Atchison & N. R. Co. v. Baty, supra.* The special practical application of the principles to which we have just referred refer to the alleged attempt to deprive parties of the right to contract as they see fit, and will, therefore, be treated under that head.

3. In *Braceville Coal Co. v. People,* there was filed October 26, 1893, by the supreme court of Illinois an opinion, reported in 147 Ill., 66, in which was the following language: "There can be no liberty protected by government that is not regulated by such laws as will preserve the right of each citizen to pursue his own advancement and happiness in his own way, subject only to the restraints necessary to secure the same right to all others. The fundamental principle upon which such liberty is based, in free and enlightened government, is equality under the law of the land. It has accordingly been everywhere held that liberty, as that term is used in the constitution, means not only freedom of the citizen from servitude and restraint, but is deemed to embrace the right of every man to be free in the use of his powers and faculties, and to adopt and pursue such a vocation or calling as he may

14

choose, subject only to the restraints necessary to secure the common welfare. (*Frorer v. People, supra; Commonwealth v. Perry,* 28 N. E. Rep. [Mass.], 1126; *People v. Gillson,* 109 N. Y., 389; *Live Stock Dealers & Butchers Association v Crescent City Live Stock Landing & Slaughter House Co.* 1 Abb. [U. S.], 388; *Slaughter House Cases,* 16 Wall. [U. S.], 36; *Godcharles v. Wigeman,* 113 Pa. St., 431; *State v. Goodwill,* 33 W. Va., 179.) Property, in its broader sense, is not the physical thing which may be the subject of ownership, but is the right of dominion, possession, and power of disposition which may be acquired over it; and the right of property preserved by the constitution is the right not only to possess and enjoy it, but also to acquire it in any lawful mode, or by following any lawful industrial pursuit which the citizen, in the exercise of the liberty guarantied, may choose to adopt. Labor is the primary foundation of all wealth. The property which each one has in his own labor is the common heritage; and as an incident to the right to acquire other property, the liberty to enter into contracts by which labor may be employed in such way as the laborer shall deem most beneficial, and of others to employ such labor, is necessarily included in the constitutional guaranty. * * * We need not extend this opinion by further discussion. The right to contract necessarily includes the right to fix the price at which labor will be performed and the mode and time of payment. Each is an essential element of the right to contract, and whosoever is restricted in either, as the same is enjoyed by the community at large, is deprived of liberty and property."

For a further discussion of these propositions reference is made to the case entitled *Application of Jacobs,* 98 N. Y., 106. A complete review of the authorities upon this point will be found in *Leep v. St. Louis, I. M. & S. R. Co.,* 25 S. W. Rep. [Ark.], 75, in which the opinion of the supreme court of Arkansas was filed February 23, 1894. It is the latest case which has come under our observation,

and is strictly in line with those above quoted from and cited as to the questions under consideration.

A full and careful examination of all the questions presented has satisfied us that sections 1 and 3 of the act discussed are unconstitutional for the reasons above assigned. The legislation attempted cannot be defended as a police regulation, as was attempted in argument, for, under pretense of the exercise of that power, the legislature cannot prohibit harmless acts which do not concern the health, safety, and welfare of society. (*Millett v. People, supra; Frorer v. People, supra; State v. Loomis, supra; Ex parte Kuback,* 85 Cal., 274; *Application of Jacobs, supra; People v. Gillson, supra.*) The claim that this act was a proper exercise by the legislature of its police power cannot be sustained. It results that the judgment of the district court is

AFFIRMED.